COPY

1  HELANE L. MORRISON (Bar No. 127752)
   SUSAN LAMARCA (Bar No. 215231)
2    (lamarcas@sec.gov)
   SHEILA E. O'CALLAGHAN (Bar No. 131032)
3    (ocallaghans@sec.gov)

4  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
5  44 Montgomery Street, Suite 2600
   San Francisco, California 94104
6  Telephone: (415) 705-2500

E-filing

7

8

9                      UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11                           SAN JOSE DIVISION

12 SECURITIES AND EXCHANGE COMMISSION,     Civil Action No. ___ C 06  2239 JF

13                Plaintiff,

14        v.                                COMPLAINT

15 THOMAS A. SKOULIS, PETER M. FRANKL,
   ALAN B. LEFKOF and WILLIAM D. BAKER     PVT
16

17                Defendants.

18

19

20        Plaintiff Securities and Exchange Commission (the "Commission") alleges:

21                        SUMMARY OF THE ACTION

22        1.     This matter arises out of a financial reporting fraud scheme at Netopia, Inc. ("Netopia"

23 or the "Company"), an Emeryville, California corporation that provides broadband and wireless

24 products and services. In 2002 and again in 2003, Netopia improperly reported revenue on two major

25 software deals with a thinly capitalized customer who did not have the legal obligation to pay for the

26 software. As a result, Netopia reported inflated revenue in two fiscal quarters and posted its first

27 profitable quarter in over three years.

28        2.     In both instances, Netopia's former head of worldwide sales, Thomas A. Skoulis, and

Complaint                                      1

1   former head of software sales, Peter M. Frankl, arranged for the customer, a software reseller, to place

2   major orders with Netopia, while at the same time agreeing with the customer in undisclosed "side

3   agreements" that the reseller would not have a firm obligation to pay Netopia for the software.  For

4   each transaction, Netopia improperly reported approximately $750,000 in revenue that was only due

5   if and when Netopia's reseller customer was paid by an end user according to the side arrangements.

6          3.      Also, for the first transaction, Netopia's then Chief Financial Officer William D. Baker

7   improperly authorized the Company to report the $750,000 of revenue notwithstanding evidence that

8   collection by Netopia was not probable.

9          4.      In later efforts by Netopia to collect payment on the second transaction, first Baker and

10  then later Netopia Chief Executive Officer Alan B. Lefkof learned of the payment contingency

11  contained in the side agreement, but they failed to take immediate corrective action.  As a result,

12  Lefkof and Baker allowed the Company to publicly treat the unpaid contract as a bad debt, and to

13  avoid reporting that Netopia had improperly inflated its revenue for the fiscal quarter and year ended

14  September 30, 2003.

15                          JURISDICTION AND VENUE

16         5.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the

17  Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and

18  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

19         6.      This Court has jurisdiction over this action pursuant to Sections 20(c) and 22(a) of the

20  Securities Act [15 U.S.C. §§ 77t(c) and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §

21  78aa].  The defendants, directly or indirectly, have made use of the means and instrumentalities of

22  interstate commerce, of the mails, or of the facilities of a national securities exchange in connection

23  with the acts, practices and courses of business alleged in this complaint.

24         7.      Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C.

25  § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Skoulis, Baker and Lefkof reside in

26  and acts or transactions constituting violations occurred in the Northern District of California.

27

28

Complaint                                    2

INTRADISTRICT ASSIGNMENT

8.      Assignment to the San Jose Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places in this district, in Santa Clara County.

DEFENDANTS

9.      Thomas A. Skoulis, age 49, resides in Menlo Park, California.  At the time of the events alleged in the complaint, Skoulis was the Senior Vice President of Sales and an officer of Netopia.  In that position, Skoulis had responsibility for overseeing sales at Netopia.  Skoulis was fired by Netopia.

10.     Peter M. Frankl, age 38, resides in Addison, Texas.  At the time of the events alleged in the complaint, Frankl was the Vice President of Sales and Marketing at Netopia, where he was responsible for managing software sales.  Frankl reported to Skoulis.  Frankl was fired by Netopia.

11.     Alan B. Lefkof, age 52, resides in Tiburon, California.  At the time of the events alleged in the complaint, Lefkof was the President, Chief Executive Officer and a member of the board of directors of Netopia.  Lefkof currently still holds those positions.

12.     William D. Baker, age 59, resides in Fremont, California, and was a licensed Certified Public Accountant in the State of Indiana.  At the time of the events alleged in the complaint, Baker was the Senior Vice President of Finance and Operations and the Chief Financial Officer of Netopia.  Baker was asked to resign by Netopia.

RELEVANT ENTITY

13.     Netopia is a Delaware corporation headquartered in Emeryville, California.  During the time the events described herein occurred, Netopia maintained other offices, including an office in Santa Clara County.  Netopia develops, markets and supports broadband and wireless products and services including both computer hardware and software.  At the time of the events alleged in this complaint, Netopia had common stock registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78l(g)], which was listed on the NASDAQ National Market.

1 | FACTUAL ALLEGATIONS

2 | **Netopia Enters into a Software Transaction in its Third Fiscal Quarter Ended June 30, 2002**

3 | **Subject to an Undisclosed Payment Contingency**

4 |     14.    In 2002, Netopia's software sales force, led by head of worldwide sales, defendant

5 | Skoulis, and head of software sales, defendant Frankl, began negotiating the Company's first sale to

6 | Interface Computer Communications ("ICC"), a small software reseller that intended to resell

7 | Netopia's software to a public school district.  ICC was a new customer to Netopia, with whom

8 | Netopia had not previously conducted business.

9 |     15.    On May 23, 2002, in Netopia's third fiscal quarter, ICC issued a $1.6 million order to

10 | purchase software from Netopia.  The order represented one of the largest single orders for software

11 | Netopia had received to date.

12 |     16.    During negotiations, ICC's president informed Frankl that if ICC was not paid by its

13 | own customer, ICC could not pay Netopia.  Frankl told Skoulis that ICC would not pay Netopia

14 | unless and until ICC received a purchase order from the end user of the software, the public school

15 | district.

16 |     17.    The purchase order ICC submitted to Netopia stated on its face that ICC would make

17 | two payments and that the "second payment [would] be made upon receipt of a second PO [Purchase

18 | Order] from Board of Education…PO should be received in July and payment can be made in

19 | August."  Skoulis and Frankl each saw the ICC purchase order, which indicated that ICC's obligation

20 | to pay Netopia was contingent on future events, and not a fixed certainty.

21 |     18.    Frankl concealed the contingency from others at Netopia by directing that the

22 | contingency language be physically redacted – "whited out" – from the face of ICC's purchase order.

23 | Frankl knew that a purchase order with the contingency language would be rejected by Netopia's

24 | order management department because Netopia could not record the sale as revenue during that

25 | reporting period with the payment contingency.  Netopia's order management personnel entered the

26 | ICC order into the system based on the redacted purchase order.

27 |     19.    By reporting revenue on this transaction, Netopia violated Generally Accepted

28 | Accounting Principles ("GAAP"), the accounting standards that public reporting companies must

Complaint                     4

1    follow in the United States. Since payment by ICC to Netopia was contingent upon ICC's receipt of

2    its payment from its own customer, the transaction failed the GAAP requirement that ICC have a

3    fixed obligation to pay Netopia at the time Netopia recorded revenue from the transaction.

4         20.     Even apart from this contingency, members of Netopia's finance department informed

5    Baker that ICC did not have the financial strength to qualify for a $1.6 million line of credit. A credit

6    check performed by Netopia indicated that ICC qualified for at most $15,000 in credit – far lower

7    than the $1.6 million order. Pursuant to GAAP, a company cannot report revenue if it is not probable

8    that the company will be able to collect its purchase price from its customer. Baker nevertheless

9    authorized the recognition of revenue.

10        21.     ICC paid Netopia the first installment of approximately $800,000 in late June 2002,

11    the last month of Netopia's third quarter, after ICC's school district customer made a payment to ICC.

12        22.     On August 14, 2002, Netopia filed with the Commission a quarterly report on Form

13    10-Q for the third quarter ended June 30, 2002. The financial statements in Netopia's quarterly report

14    improperly included approximately $750,000 in revenue -- web platform licenses and services

15    revenue -- from the ICC transaction. At the time Netopia booked this revenue, collection by Netopia

16    on the remaining balance was not probable and ICC did not have an obligation to pay, and therefore

17    reporting the $750,000 in revenue was improper and violated GAAP. As a result, Netopia's revenue

18    was inflated by 13.7 percent and its operating loss was understated by 13 percent. Netopia also

19    publicly announced the same falsely inflated third quarter financial results on July 23, 2002 in a press

20    release.

21        23.     Consistent with the side arrangement, ICC did not pay the remaining balance described

22    in its purchase order to Netopia until months later, in September 2002, after ICC had received a

23    further payment from its school district customer.

24        24.     Skoulis and Frankl knew, or were reckless in not knowing, that their undisclosed side

25    agreement with ICC altering the terms of the purchase order, and their concealment of the payment

26    contingency, would result in Netopia materially misstating its financial results to the public.

27    Separately, Baker knew, or was reckless in not knowing, that reporting revenue on the transaction was

28    improper because Netopia did not have a reasonable basis to believe that it would collect from ICC.

**Netopia Negotiates a Second Improper Transaction with ICC in the Fourth Fiscal Quarter Ended September 30, 2003**

25.     In 2003, Netopia and ICC were discussing another possible software transaction for a different school district.  Based on early discussions, Skoulis included a $750,000 sale to ICC in his forecast for sales to be completed by Netopia during the fourth quarter ending September 30, 2003.  However, as the end of Netopia's fiscal year drew to a close, Frankl informed Skoulis that ICC would not be placing the $750,000 order by the end of the reporting period because the scope of ICC's intended project with their customer had changed.  This larger deal was in the preliminary stages.  Skoulis nevertheless directed Frankl to obtain a purchase order from ICC for $750,000, the amount he had forecast.

26.     On September 30, 2003, the final day of Netopia's 2003 fiscal year, ICC sent a purchase order to Netopia for the purchase of software in the amount of $750,400.  However, ICC made the purchase order subject to another, undisclosed side agreement that materially altered the terms stated in ICC's purchase order.

27.     Under the terms of the side agreement, Frankl and Skoulis agreed, as a basis for ICC submitting the $750,400 purchase order to Netopia, that ICC would not pay Netopia unless and until ICC received a contract from ICC's school district customer.  At the time, ICC had not yet obtained a contract from the school district.

28.     In early October 2003, in response to receiving a routine audit request from Netopia's outside auditors asking that ICC confirm the terms of the September 2003 purchase order, ICC sent a letter to Frankl confirming the side agreement.

29.     ICC stated in the letter, dated October 7, 2003, that ICC's September 2003 purchase order "is only valid upon ICC's receipt of a Purchase Order" from ICC's intended customer, a public school district.  ICC further stated that if the school district "decides at any point that they are no longer interested in the Purchase of [Netopia software], ICC will not be held liable or accountable for [its] Purchase Order" submitted to Netopia on September 30, 2003.

30.   Frankl discussed the ICC side letter with Skoulis.  Skoulis instructed Frankl not to show the side letter to anyone else.  Frankl kept the side letter in his desk drawer and did not forward it to Netopia's finance department, including the Company's order management personnel.

31.   Nevertheless, as part of the fraudulent scheme, Frankl, at Skoulis' urging, contacted ICC's president and reaffirmed the side agreement:  that ICC did not have to pay Netopia for the September 2003 order until ICC was paid by its own customer.

32.   Netopia recorded approximately $750,000 in revenue from the ICC purchase order for the fourth quarter, although the payment contingency made it improper to do so under GAAP.  As with the earlier ICC transaction, recording revenue on a purchase order that was subject to a payment contingency violated the GAAP requirement that the purchaser's payment obligation be fixed at the time Netopia recorded the revenue.

33.   On December 19, 2003, Netopia filed with the Commission its annual report on Form 10-K for the fiscal year ended September 30, 2003, which included financial statements that were improperly inflated by the approximately $750,000 in revenue -- web platform and services revenue -- from the ICC order.  As a result, Netopia's revenue for the fourth quarter was overstated by 16 percent.  The financial statements in the Form 10-K also materially overstated revenue based on the order.  Netopia reported quarterly income of approximately $300,000 – the Company's first profit since the quarter ended June 30, 2000.  Without the falsely reported ICC transaction, Netopia's income would have actually reflected a <u>loss</u> of more than $400,000 for that quarter.  Netopia publicly announced its falsely inflated quarterly revenue and income in a November 5, 2003 press release.

34.   Skoulis and Frankl knew, or were reckless in not knowing, that the undisclosed side agreements with ICC altering the terms of the purchase orders, and their concealment of the payment contingencies from others, would result in Netopia materially misstating its financial results to the public.

<u>Lefkof and Baker Learn of the Payment Contingency in 2004</u>

35.   Netopia CEO Lefkof and then-CFO Baker subsequently learned of the side agreement with ICC.  Nonetheless, as described below, they failed to take prompt corrective action, allowing the Company to avoid reporting to the public that Netopia had improperly inflated its revenue for the

1    fourth quarter and its revenue for the year ended September 30, 2003 and understated its loss for the

2    same period.

3         36.    In October 2003, Skoulis asked his superiors to approve extending typical payment

4    terms for the September 2003 purchase order.  Extending the payment terms helped, for a time, to

5    conceal from Netopia's finance personnel and outside auditors the undisclosed payment contingency

6    in the side agreement because the finance personnel delayed taking steps to try to collect from ICC.

7         37.    By April 2004 – over six months after the second sale to ICC – ICC had yet to pay any

8    of the $750,000 it supposedly owed Netopia.  At Lefkof's direction, Baker, accompanied by Skoulis,

9    met with ICC's president.  During the meeting, Baker learned of the improper side agreement making

10   payment contingent on ICC reselling the product to the school district (an event which had yet to

11   transpire).

12        38.    Baker subsequently attended a meeting of Netopia's Audit Committee on April 19,

13   2004.  Although ICC was discussed, Baker failed to report the payment contingency.  Instead, Baker

14   agreed that he would try to obtain a payment schedule from ICC.

15        39.    On April 27, 2004, ICC sent Baker a proposed payment schedule expressly providing

16   that such payments would be contingent on ICC's receipt of payments from the end user school

17   district.  Baker asked Frankl to have the ICC email establishing the payment schedule "cleaned up" so

18   that the document did not contain the contingent payment language.

19        40.    Frankl emailed ICC with instructions to "cut and paste" the payment schedule he

20   provided into an email to Baker eliminating the contingent language.  Based on Frankl's instructions,

21   ICC provided an email that had no reference to the end user school district and did not contain the

22   contingent payment language.

23        41.    On May 6, 2004, Baker falsely informed the Audit Committee that there was a firm

24   payment schedule and that ICC would have the cash available on the dates in the schedule to make

25   the payments.  On June 18, 2004, after ICC failed to make the payments in accordance with the April

26   payment schedule, Netopia sent a demand letter to ICC.  In response, ICC informed Netopia's

27   controller, who in turn informed Lefkof, that ICC refused to pay Netopia and claimed that the

28   September purchase order was not valid.

42.     Two weeks later, on July 2, ICC provided a copy of the October 7, 2003 side letter to Netopia, a copy of which was received by Lefkof.

Lefkof and Baker Allow the Company to Issue a False Press Release on July 6, 2004

43.     On July 6, 2004, Lefkof and Baker participated in an Audit Committee meeting to review a press release that Netopia planned to issue later that day.  Among other things, the press release announced that the Company was going to write off the ICC receivable as a bad debt.  Both Lefkof and Baker understood that a write-off would only be appropriate if the ICC transaction was properly recorded as revenue in the first instance; the side letter, however, suggested that the transaction was improperly recorded, and that the Company's financial statements for the year ended September 30, 2003 might need to be restated.  Nonetheless, during this meeting, neither Lefkof nor Baker mentioned the side letter or the contingency to the Audit Committee members.

44.     Instead, the Audit Committee approved the press release, which was issued by Netopia on July 6, 2004, and filed with the Commission as an exhibit to a current report on Form 8-K signed by both Lefkof and Baker.

Subsequent Events and the Restatement

45.     On July 12, 2004, Netopia's Audit Committee obtained a copy of the October 7, 2003 side letter modifying ICC's September 2003 purchase order.

46.     On July 22, 2004, after the close of the market, Netopia announced that the board's Audit Committee was conducting an internal investigation.  The next trading day after the Company made the announcement, the closing price of its common stock fell from $4.31 per share to $3.60 (a 16 percent decline).

47.     On February 1, 2005, following the internal investigation by Netopia's Audit Committee, Netopia announced it was restating its financial statements due to the two improperly recorded software transactions (as well as other unrelated items).  For the first ICC transaction, recorded as revenue in the quarter ended June 30, 2002, Netopia eliminated $750,000 of software license revenue, deferring $632,000 of such revenue to the following quarter.  After elimination of the improperly recorded revenue from the 2002 ICC transaction, Netopia's restated software revenue for the second quarter ended June 30, 2002 declined to $4.7 million, or by approximately 13.7 percent

1  from the originally reported revenue.  Similarly, Netopia's restated operating loss for that period

2  increased by approximately 13 percent, to $5.7 million.

3      48.     For the second ICC transaction, recorded as revenue in the fourth quarter ended

4  September 30, 2003, Netopia eliminated software license, maintenance and deferred revenue of

5  $750,400.  Consequently, Netopia's overall restated revenue for the fourth quarter of 2003 declined to

6  $3.9 million from what the Company had previously reported, or by approximately 16 percent.

7  Eliminating the revenue from the ICC transaction resulted in Netopia reporting an operating loss of

8  approximately $400,000 for the fourth quarter of 2003, rather than the previously-reported profit of

9  approximately $300,000.

10      Skoulis and Frankl Were Unjustly Enriched by their Fraudulent Scheme

11      49.     During the period from 2002 through 2004, Skoulis and Frankl were unjustly enriched

12  by their conduct at Netopia, including compensation from Netopia.  In addition, Skoulis and Frankl

13  sold Netopia common stock during and immediately after their participation in the fraud.  Skoulis

14  sold approximately 47,500 shares of Netopia stock.  Frankl sold approximately 5,000 shares of

15  Netopia stock.

16                              FIRST CLAIM FOR RELIEF
                      (Violations of Section 10(b) of the Exchange Act and
17                    Rule 10b-5 Thereunder by Skoulis, Frankl and Baker)

18      50.     The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

19  above.

20      51.     By engaging in the conduct described above, Skoulis, Frankl and Baker, directly or

21  indirectly, in connection with the purchase or sale of securities, by the use of means or

22  instrumentalities of interstate commerce, or the mails, with scienter:

23          (a)     employed devices, schemes, or artifices to defraud;

24          (b)     made untrue statements of material facts or omitted to state material facts

25                  necessary in order to make the statements made, in the light of the

26                  circumstances under which they were made, not misleading; and

27

28

Complaint                                   10

1          (c)      engaged in acts, practices, or courses of business which operated or would

2                   operate as a fraud or deceit upon other persons, including purchasers and

3                   sellers of securities.

4          52.      By reason of the foregoing, Skoulis, Frankl and Baker have violated, and unless

5   restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §

6   78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

7                              SECOND CLAIM FOR RELIEF
                          (Aiding and Abetting Violations of Section 10(b) of the
8                   Exchange Act and Rule 10b-5 Thereunder by Skoulis and Frankl)

9          53.      The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

10  above.

11         54.      By engaging in the conduct described above, Netopia, Skoulis and Frankl, directly or

12  indirectly, in connection with the purchase or sale of securities, by the use of means or

13  instrumentalities of interstate commerce, or the mails, with scienter:

14         (a)      employed devices, schemes, or artifices to defraud;

15         (b)      made untrue statements of material facts or omitted to state material facts

16                  necessary in order to make the statements made, in the light of the

17                  circumstances under which they were made, not misleading; and

18         (c)      engaged in acts, practices, or courses of business which operated or would

19                  operate as a fraud or deceit upon other persons, including purchasers and

20                  sellers of securities.

21         55.      Skoulis and Frankl knowingly provided substantial assistance to violations of Section

22  10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and

23  therefore are liable as aiders and abettors pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §

24  78t(e)].

25         56.      Unless restrained and enjoined, Skoulis and Frankl will continue to violate and aid and

26  abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.

27  § 240.10b-5].

28

Complaint                                          11

| | | |
|---|---|---|
| 1 | | THIRD CLAIM FOR RELIEF |
| 2 | | (Violations of Section 17(a) of the Securities Act by Baker) |

3   57.   The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

4   above.

5   58.   By engaging in the conduct described above, Baker, directly or indirectly, in the offer

6   or sale of securities, by use of the means or instruments of transportation or communication in

7   interstate commerce or by use of the mails with scienter:

8   (a)   employed devices, schemes, or artifices to defraud;

9   (b)   obtained money or property by means of untrue statements of material fact

10   or by omitting to state a material fact necessary in order to make the

11   statements made, in light of the circumstances under which they were

12   made, not misleading; and

13   (c)   engaged in transactions, practices, or courses of business which operated

14   or would operate as a fraud or deceit upon the purchasers.

15   59.   By reason of the foregoing, Baker violated, and unless restrained and enjoined, will

16   continue to commit violations of, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

17   FOURTH CLAIM FOR RELIEF

18   (Violations of Sections 17(a)(2) and (3) of the Securities Act by Lefkof)

19   60.   The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

20   above.

21   61.   By engaging in the conduct described above, Lefkof, directly or indirectly, in the offer

22   or sale of securities, by use of the means or instruments of transportation or communication in

23   interstate commerce or by use of the mails:

24   (a)   obtained money or property by means of untrue statements of material fact

25   or by omitting to state a material fact necessary in order to make the

26   statements made, in light of the circumstances under which they were

27   made, not misleading; and

28

1          (b)      engaged in transactions, practices, or courses of business which operated

2                   or would operate as a fraud or deceit upon the purchasers.

3          62.      By reason of the foregoing, Lefkof has violated, and unless restrained and enjoined,

4   will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and

5   (3)].

6                              FIFTH CLAIM FOR RELIEF
                     (False Statements and Omissions to Accountants and Auditors—
7                              Violation of Rule 13b2-2 by Baker)

8          63.      The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

9   above.

10         64.      By engaging in the acts and conduct alleged above, Baker, directly or indirectly,

11  knowingly made or caused to be made a materially false or misleading statements or omitted to state

12  or caused another person to omit to state, material facts necessary in order to make statements made,

13  in light of the circumstances under which such statements were made, not misleading to an

14  accountant in connection with an audit or examination of the financial statements of Netopia required

15  to be made or the preparation or filing of reports required to be filed by Netopia with the

16  Commission.

17         65.      By reason of the foregoing, Baker has violated and, unless restrained and enjoined,

18  will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

19                             SIXTH CLAIM FOR RELIEF
                     (False Periodic Reports—Aiding and Abetting Violations
20                     of Section 13(a) of the Exchange Act and Rules 12b-20,
                       13a-1 and 13a-13 Thereunder by Skoulis and Frankl)
21

22         66.      The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

23  above.

24         67.      Based on the conduct alleged above, Netopia violated Section 13(a) of the Exchange

25  Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20,

26  240.13a-1 and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of

27  the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate annual and quarterly

28  reports.

1    68.     By engaging in the conduct alleged above, Skoulis and Frankl knowingly provided

2    substantial assistance to Netopia's filing of materially false and misleading reports with the

3    Commission.

4    69.     By reason of the foregoing, Skoulis and Frankl aided and abetted violations by

5    Netopia of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-

6    13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].  By reason of the foregoing,

7    Lefkof and Baker have aided and abetted violations by Netopia of Section 13(a) of the Exchange Act

8    [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-11 thereunder [17 C.F.R. §§ 240.12b-20, and

9    240.13a-11] and Baker has also aided and abetted violations by Netopia of Rule 13a-13 thereunder

10   [17 C.F.R. §240.13a-13].  Unless restrained and enjoined, Skoulis, Frankl, Lefkof and Baker will

11   continue to aid and abet such violations.

12                        SEVENTH CLAIM FOR RELIEF
                (Inaccurate Books and Records—Aiding and Abetting Violations of
13         Section 13(b)(2)(A) of the Exchange Act by Skoulis, Frankl, Lefkof and Baker)

14   70.     The Commission realleges and incorporates by this reference Paragraphs 1 through 49,

15   above.

16   71.     Based on the conduct alleged above, Netopia violated Section 13(b)(2)(A) of the

17   Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered pursuant to

18   Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records and accounts

19   which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets

20   of the issuer.

21   72.     By engaging in the conduct alleged above, Skoulis, Frankl, Lefkof and Baker

22   knowingly provided substantial assistance to Netopia's failure to make and keep books, records and

23   accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of

24   its assets.

25   73.     By reason of the foregoing, Skoulis, Frankl, Lefkof and Baker have aided and abetted

26   violations by Netopia of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

27   Unless restrained and enjoined, Skoulis, Frankl, Lefkof and Baker will continue to aid and abet such

28   violations.

EIGHTH CLAIM FOR RELIEF
(Inadequate Internal Accounting Controls—Aiding and Abetting
Violations of Section 13(b)(2)(B) of the Exchange Act by Lefkof and Baker)

74.     The Commission realleges and incorporates by this reference Paragraphs 1 through 49, above.

75.     Based on the conduct alleged above, Netopia violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls.

76.     By engaging in the conduct alleged above, Lefkof and Baker knowingly provided substantial assistance to Netopia's failure to devise and maintain a sufficient system of internal accounting controls.

77.     By reason of the foregoing, Lefkof and Baker have aided and abetted violations by Netopia of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].  Unless restrained and enjoined, Lefkof and Baker will continue to aid and abet such violations.

NINTH CLAIM FOR RELIEF
(Circumventing Internal Accounting Controls—Violation of
Section 13(b)(5) of the Exchange Act by Skoulis, Frankl and Baker)

78.     The Commission realleges and incorporates by this reference Paragraphs 1 through 49, above.

79.     By the conduct alleged above, Skoulis, Frankl and Baker violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] which prohibits anyone from knowingly circumventing a system of internal accounting, or knowingly falsifying certain books, records, and accounts.

80.     Unless restrained and enjoined, Skoulis, Frankl and Baker will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

TENTH CLAIM FOR RELIEF
(Falsifying Books and Records --- Violation of Rule 13b2-1 of the
Exchange Act by Skoulis, Frankl, Lefkof and Baker)

81.     The Commission realleges and incorporates by this reference Paragraphs 1 through 49, above.

1    82.    By engaging in the conduct described above, Skoulis, Frankl, Lefkof and Baker

2  falsified or caused to be falsified Netopia's books, records and accounts in violation of Rule 13b2-1

3  under the Exchange Act [17 C.F.R. § 240.13b2-1].

4    83.    Skoulis, Frankl, Lefkof and Baker have violated and, unless restrained and enjoined, will

5  continue to violate, Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

6                        ELEVENTH CLAIM FOR RELIEF
7                    (False Sarbanes-Oxley Certifications – Violation
                       of Rule 13a-14 under the Exchange Act by Baker)
8

9    84.    The Commission realleges and incorporates by reference Paragraphs 1 through 49,

10  above.

11    85.    As Netopia's Chief Financial Officer, defendant Baker signed false certifications

12  pursuant to Rule 13a-14 under the Exchange Act [17 C.F.R. § 240.13a-14] which were included in

13  Netopia's quarterly report on Form 10-Q for the quarter ended March 31, 2004.  In such certification,

14  defendant Baker falsely stated, among other things, that:  (a) the report did not contain any untrue

15  statement of a material fact or omit to state a material fact necessary to make the statements made, in

16  light of the circumstances under which such statements were made, not misleading; (b) the financial

17  statements, and other financial information included in the report, fairly presented in all material

18  respects the financial condition, results of operations, and cash flows of Netopia as of, and for, the

19  period presented in the report; and (c) he had disclosed to Netopia's auditors all significant

20  deficiencies in the design or operation of Netopia's internal controls and any fraud, whether or not

21  material, that involved management or other employees who had a significant role in Netopia's

22  internal controls.

23    86.    By reason of the foregoing, Baker has violated and, unless restrained and enjoined,

24  will continue to violate Exchange Act Rule 13a-14 [17 C.F.R. §240.13a-14].

25                              PRAYER FOR RELIEF

26      WHEREFORE, the Commission respectfully requests that this Court:

27

28

## I.

Permanently enjoin Skoulis and Frankl from directly or indirectly violating Sections 10(b) and 13(b)(5) of the Exchange Act  [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13];

## II.

Permanently enjoin Lefkof from directly or indirectly violating Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)], and Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and Rules 12b-20 and 13a-11 [17 C.F.R. §§ 240.12b-20 and 240.13a-11] thereunder;

## III.

Permanently enjoin Baker from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. § 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)], and Rules 12b-20, 13a-11, 13a-13, and 13a-14 [17 C.F.R. §§, 240.12b-20, 240.13a-11, 240.13a-13, and 240.13a-14] thereunder;

## IV.

Prohibit Skoulis and Baker, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from serving as an officer or director of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78*o*(d)];

## V.

Order defendants Skoulis and Frankl to disgorge any wrongfully obtained benefits, including prejudgment interest.

1                                         VI.

2       Order Skoulis, Frankl, Lefkof and Baker to pay civil penalties pursuant to Section 20(d) of the

3 Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

4                                        VII.

5       Retain jurisdiction of this action in accordance with the principles of equity and the Federal

6 Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

7 may be entered, or to entertain any suitable application or motion for additional relief within the

8 jurisdiction of this Court.

9                                        VIII.

10       Grant such other and further relief as this Court may determine to be just and necessary.

11

12 DATED:       March 28, 2006            Respectfully Submitted,

13

14

15                                      Sheila E. O'Callaghan

                                     Attorney for Plaintiff

16                                      SECURITIES AND EXCHANGE COMMISSION

17

18

19

20

21

22

23

24

25

26

27

28